UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  6/20/2025
```

-------------------------------------------------------------------X

RECOOP LLC,                                    :

                    Plaintiff,             :

                             :

        -v-                    :

                             :

OUTLIERS INC. d/b/a THESIS             :
NOOTROPICS INC.,                          :
                             :

              Defendant.            :

------------------------------------------------------------

                             :

OUTLIERS INC. d/b/a THESIS             :
NOOTROPICS INC. and DANIEL            :
FREED,                                         :
              Counterclaim and       :
            Third-party Plaintiffs.   :

         -v-                    :

                             :

RECOOP LLC and ANASTASIA ALT,       :

              Counterclaim and       :
            Third-party Defendants.   :

-------------------------------------------------------------------X

24-cv-01810 (LJL)

MEMORANDUM &
ORDER

LEWIS J. LIMAN, United States District Judge:

    Plaintiff Recoop LLC ("Plaintiff" or "Recoop") moves for reconsideration, pursuant to

Local Rule 6.3, of this Court's Opinion and Order of April 14, 2025, granting summary

judgment for Defendant Outliers Inc. d/b/a Thesis Nootropics Inc. ("Defendant" or "Thesis").

Thesis moves, pursuant to Federal Rule of Civil Procedure 11 and the Defend Trade Secrets Act

("DTSA"), 18 U.S.C. § 1836(b)(3)(D), for an award of attorney's fees.  Dkt. No. 102.  For the

reasons that follow, Recoop's motion for reconsideration is denied, Thesis's motion for Rule 11

sanctions and for attorney's fees under the DTSA is denied.

## BACKGROUND

### I.    Procedural History

This case has, from the outset, been riddled with accusations from Plaintiff which have not been followed by proof or even efforts to obtain proof.  An extended discussion of the procedural history is necessary for an explanation of the Court's decision on this motion.

Plaintiff describes itself as a "direct-to-consumer startup that sells nutritional supplements for people who take stimulants for focus and concentration."  Dkt. No. 1 ¶ 6.  It describes Thesis as a competitor and "a high-flying direct-to-consumer startup company in the buzzy 'nootropic' health supplement space."  *Id.* ¶ 1.

Plaintiff began this case on March 8, 2024, accusing Defendant of stealing its trade secrets in violation of the DTSA and the common law, as well as the Wiretap Act, 18 U.S.C. § 2510, *et seq.*, and the California Invasion of Privacy Act ("CIPA"), Cal. Pen. Code §§ 630–638.  Dkt. No. 1.  It alleged that "Thesis—then reportedly operating out of its founder's apartment during its 'humble beginnings'—gained access to Recoop's website backend and secretly inserted two tracking devices in the form of computer code—a Meta Facebook & Instagram Pixel and a Google Site Tag" and used those two components to obtain customer communications and proprietary data, to build its own business, and to "sabotage Recoop's digital advertising and marketing efforts that were deployed using Recoop's own (legitimate) Meta Facebook & Instagram Pixel and Google Site Tag."  *Id.* ¶¶ 7–9.  Recoop failed to disclose that the Thesis "founder" in question was an individual named Daniel Freed (Counterclaim-Plaintiff, hereafter "Freed"), who was also an employee of Recoop at the time of the alleged access and installation.  It was in Freed's capacity as a Recoop employee and with Recoop's permission that he gained access to Recoop's website backend, and it was for Recoop's benefit and with its knowledge that he inserted the computer code.

Thesis answered the original complaint and filed counterclaims against Recoop on May 24, 2024, Dkt. No. 13, including third-party claims by Freed against Recoop and its founder and Chief Executive Officer Anastasia Alt ("Alt"). *Id.* Thesis and Freed amended their answer and counterclaims in response to Recoop's First Amended Complaint on July 3, 2024, Dkt. No. 23.[1] Thesis and Freed counterclaim that Freed was a co-founder, member, officer, and employee of Recoop during the time relevant to Recoop's complaint, and that he worked on Recoop's website and inserted marketing pixels and tags under the direction of and with the knowledge of Alt. *Id.* ¶ 71. They deny that Freed or Thesis improperly accessed or used Recoop's confidential information after his departure from Recoop. *Id.* ¶¶ 34–39. Thesis and Freed asserted counterclaims and third-party claims against Recoop and Alt for a declaratory judgment that no breach of Freed's separation agreement had occurred, defamation, breach of contract, and tortious interference with prospective business relations. *Id.* ¶ 9.

Recoop, then represented by Ariel Reinitz, Esq., submitted a proposed Case Management Plan and Scheduling Order on July 8, 2024. Dkt. No. 24. The proposed Case Management Plan and Scheduling Order provided for initial requests for production of documents and interrogatories to be served by August 5, 2024, depositions to be completed by November 12, 2024, all fact discovery to be completed by November 12, 2024, and expert discovery to be completed by December 27, 2024. *Id.* The Court adopted the Case Management Plan and

---

[1] Plaintiff filed its First Amended Complaint ("FAC") against Thesis on June 28, 2024. Dkt. No. 19. The FAC contained substantially identical allegations, merely adding "Google Analytics Pixel" to "Meta Facebook & Instagram Pixel and a Google Site Tag" as a technology Plaintiff alleges Thesis used to spy on Recoop's website activity, and in some places, using more passive language to characterize Thesis's alleged misconduct, *compare* Dkt. No. 1 ¶ 35 ("Thesis— through its CEO, Dan Freed . . . installed,") *with* Dkt. No. 19 ¶ 36 ("Thesis— through its CEO, Dan Freed . . . caused . . . to be installed").

Scheduling Order as proposed on July 15, 2024.  Dkt. No. 26.  The parties later agreed on a

protective order and an ESI protocol.  Dkt. Nos. 30–31, 34–35.

On August 2, 2024, the Court granted Thesis and Freed's letter motion for an expedited

forensic examination by Stroz Friedberg LLC ("Stroz Friedberg") on the question whether

Thesis accessed and intercepted data from Recoop's website backend without authorization,

granting at the same time Thesis's and Freed's request for Recoop to share the costs of the

examination.  Dkt. Nos. 39, 40.  The Order for Expedited Digital Forensic Examination

provided, in pertinent part, as follows:

> . . . Recoop and Thesis shall deliver or provide the following information and/or
> access to Stroz Friedberg on or before August 14, 2024:
>
>> A list of active and deactivated users for each [tag service noted in the
>> FAC] . . . Where available, provide dates associated with the provisioning
>> and deactivation of each user account . . .
>>
>> Any logging, records, or documentation indicating that each [tag service
>> noted in the FAC]. . . was capable of or configured to directly intercept
>> communications.
>>
>> Any access and billing logs or records that document account or service
>> setup, account configuration, and usage for each [tag service noted in the
>> FAC] . . .
>>
>> Access, activity, and billing logs and records related to any site trackers. . .
>
> . . . Thesis and Freed shall provide Recoop with information in their possession and
> control, if any, concerning the ownership of, control of, and/or access to [each tag
> service noted in the FAC] with an accompanying verification, and that Thesis and
> Freed shall provide Stroz Friedberg with access to any and all relevant electronic
> devices and/or accounts to investigate the existence of any information relevant to
> said accounts as part of its forensic investigation.
>
> . . . following the provision of access to relevant information, accounts, and/or
> devices to Stroz Friedberg, the parties shall confer with Stroz Friedberg regarding
> cost estimations based on the scope of the evidentiary sources to be investigated
> and shall confer in good faith to narrow and focus the scope where possible.
>
> . . . parties shall continue to confer in good faith on matters pertaining to the
> forensic investigation, expediently produce reasonably requested and relevant

> information and associated documents in connection with performing the forensic
> examination, and otherwise will cooperate with the other party and Stroz Friedberg
> in conducting the forensic examination.

Dkt. No. 36-1 at 2–4.

The order did not preclude Recoop from conducting discovery or from retaining its own

forensic expert. In fact, by email between counsel, Thesis encouraged Recoop to hire its own

expert, "if it so chooses, and we will fully cooperate and give full access to Thesis and Mr.

Freed's systems. We remain confident that any Recoop expert will reach the same conclusion as

Stroz Friedberg." Dkt. No. 96-9 at ECF 4.

Several days later and over a month after the counterclaims and third-party claims were

filed, on August 5, 2024, Recoop filed a motion to compel arbitration of the counterclaims and

third-party claims and to stay those claims pending a decision on the motion to compel

arbitration. Dkt. No. 41.

On August 15, 2024, Thesis moved this Court for an order compelling Recoop to comply

with the Expedited Digital Forensic Examination order. Dkt. No. 43. Thesis's letter motion

recited:

> [D]espite extensive efforts by this office and Stroz Friedberg to ensure timely
> commencement of the expedited forensic examination, Recoop failed to provide
> access to Stroz Friedberg by the Court-Ordered deadline of August 14. (*See* ECF
> No. 40). Recoop has further failed to provide any explanation to either us or the
> expert for its delay. Recoop should be compelled to comply and face consequences
> in the form of sanctions for its dilatory and evasive conduct.

Dkt. No. 43.

Recoop responded on August 19, 2024, that it had engaged with Stroz Friedberg and

provided the requested information:

> Recoop disputes Thesis's accusation. Over the past two weeks, Recoop engaged
> directly with Stroz Friedberg on multiple occasions. On *each* occasion, Recoop
> expressed its intention to comply with Stroz Friedberg's requests. And—to the best

of Recoop's knowledge—Recoop has done so, providing Stroz Friedberg with complete access to the requested systems.

Dkt. No. 44.[2]

The Court resolved the dispute by order of August 20, 2024, in which it required the parties to "file a report on the status of the examination on September 3 and every two weeks thereafter." Dkt. No. 45.

By the same order of August 20, 2024, the time for Thesis and Freed to respond to the motion to compel arbitration was extended without objection until after completion of the forensic examination. Dkt. Nos. 43–45. The following day, Recoop filed a motion to stay discovery as to the counterclaims and third-party claims pending a decision on the motion to compel arbitration. Dkt. No. 46. Thesis's letter in opposition to that motion noted that Recoop had only belatedly served its initial disclosures in this case and had responded only on August 20, 2024, to Thesis's discovery demands, providing blanket and boilerplate objections to all of the demands. Dkt. No. 47.

The Court resolved Recoop's motion for a stay of discovery as to the counterclaims and third-party claims by oral decision on September 3, 2024. Dkt. No. 57. It ordered that discovery would be stayed to the extent that any request "relate[d] exclusively to the counterclaims and third-party claims sought to be arbitrated and discovery sought by Freed," but that it would not be stayed with respect to "any discovery related to the complaint of Recoop or sought by Thesis with respect to the complaint of Recoop." *Id.* at 3. Accordingly, Recoop continued to have the ability to use the tools of the Federal Rules of Civil Procedure to obtain information to prosecute its claims.

---

[2] At the hearing on September 3, 2024, Recoop represented that it was cooperating "without reservation" with Stroz Friedberg and providing that firm "full access to its systems." Dkt. No. 57 at 24.

On October 10, 2024, the Court issued an order on Thesis's motion for a protective order at Dkt. No. 61.  The Court granted Thesis's request that it not be required to respond to Recoop's document demands and interrogatories without prejudice to renewal upon a showing of good cause.  Dkt. No. 66 at 5.  The Court noted that Recoop did not serve its initial document demands or interrogatories until September 19, 2024, six weeks after the deadline established by the July 15, 2025, Case Management Plan and Scheduling Order.  *Id.*  Recoop had not shown good cause for its violation of that order.  Recoop stated that it waited to serve the requests until after the Court resolved its motion for a stay of discovery, but that motion sought a stay of discovery only on the counterclaims and third-party claims of Thesis, not of Recoop's claims, and was, in any event, decided on September 3, 2024.  However, the Court gave Recoop an opportunity to seek reconsideration if it could show good cause by October 14, 2024, and gave it the right to serve interrogatories other than those under Local Rule 33.3(a).  *Id.*  The Court stayed the deposition of Freed in light of the fact that the Court had, on Recoop's request or with its consent, stayed discovery on the counterclaims and third-party claims until a decision was rendered on the motion to compel arbitration and stayed the time for a response to the motion to compel arbitration until after the forensic examination was completed.  *Id.* at 3–4.  The Court reasoned that, if it denied the motion to compel, Freed would have to be deposed twice—once on Recoop's claims and a second time on Thesis's counterclaims.  *Id.* at 4.  However, it permitted the depositions to go forward of three non-party witnesses whom Recoop had noticed.  *Id.*

Recoop did not show good cause by October 14, 2024.  Instead, on October 21, 2024, its counsel moved to withdraw.  Dkt. No. 67.

On October 22, 2024, Stroz Friedberg jointly delivered the final forensic report to the parties, which was filed on the docket that same day.  Dkt. No. 68-1; *see* Dkt. No. 96-4 (the Stroz

Friedberg Report, hereafter the "Report").  The process of drafting the Report, and Recoop's participation therein, is described in more depth below.

The Court did not immediately grant the motion to withdraw.  Instead, on October 24, 2024, it issued an order noting that Recoop was a corporate entity that would have to retain counsel in order to appear in court and warning that if the Court granted the motion to withdraw "and no other counsel timely files a notice of appearance for Plaintiff, Plaintiff will be at risk of default."  Dkt. No. 74 at 2.  The Court scheduled a hearing for October 30, 2024, and ordered Alt to be present.  *Id.*

The Court held the hearing on October 30, 2024.  Alt appeared at the hearing.  The Court inquired whether Alt understood that she could not represent Recoop, that Recoop would have to appear through counsel, and that if Recoop failed to appear through counsel in a reasonable time period it would be at risk of default.  Alt confirmed that she understood.  October 30, 2024 Hearing Transcript ("Oct. 30 Tr.") 2:23–3:7.  At the conclusion of the hearing, the parties reported that they had reached a settlement in principle, with Alt and all counsel confirming that a settlement had been reached.  *Id.* 21:3–21:9; Oct. 30, 2024 Minute Entry.  Accordingly, the Court deferred ruling on the motion to withdraw, requiring Mr. Reinitz to remain as counsel, and stayed all proceedings in the matter until November 8, 2024.  The parties reported jointly on November 8, 2024 that, having agreed in principle on a settlement, they were "working toward, but had not finalized, a settlement agreement," and requested that the Court stay proceedings an additional week, until November 15, 2024.  Dkt. No.  77.  The Court granted that request.  Dkt. No. 78.

Six days later, on November 14, 2024, Mr. Reinitz, counsel for Plaintiff, renewed his application to withdraw based on irreconcilable differences between himself and his client,

noting that the parties had reached a settlement in principle, that all that remained was to reduce the settlement to writing, and that counsel could not represent Plaintiff in connection with finalizing the settlement.  Dkt. No. 81.  The Court set a briefing schedule by order of November 15, 2024, and ordered that such schedule be served on Alt.  Dkt. No. 82.  On November 20, 2024, after the Court received several direct communications from Alt, the Court reminded the parties of the rules regarding communications with the Court and reminded Alt once again that though she could represent herself in her individual capacity as Counterclaim- and Third-Party Defendant, she could not represent Recoop, a corporate entity.  Dkt. No. 90.

On December 5, 2024, the Court granted Plaintiff's counsel's motion to withdraw, finding that there existed sufficient irreconcilable differences to make representation unreasonable and justifying withdrawal.  Dkt. No. 94.  The Court approved Plaintiff's counsel's request that the case be stayed for an additional thirty days to allow Plaintiff time to retain new counsel.  *Id.* at 3.  The Court also permitted Thesis to move for summary judgment, to file a Rule 11 motion, and to seek enforcement of the cost-sharing order for the costs of the Report.  *Id.*

## II.    **The Stroz Friedberg Report**

As described above, upon motion by Thesis, the Court ordered the engagement of Stroz Friedberg as forensic expert under the joint direction of the parties on August 2, 2024.  *See* Dkt. Nos. 39, 40.

On or around September 18, 2024, Stroz Friedberg issued an initial draft of the report to the parties and provided both Recoop and Thesis with a review and comment period.  Dkt. No. 96-9 at ECF 3–4.  Thesis's counsel requested a joint call with Recoop and Stroz Friedberg to go over Thesis's initial questions on the draft report on September 22, 2024.  *Id.* at ECF 3.  Recoop's counsel did not respond to the email or join the call, despite being sent a meeting invite.  Dkt. No. 96-1 ¶ 16.  After Stroz Friedberg issued a revised draft on or about October 2,

2024, Thesis again invited Recoop to a final review call with Stroz Friedberg, which Recoop

again neither responded to nor attended.  *Id.* ¶¶ 17–19; Dkt. No. 96-9 at ECF 5–7.  On or about

October 10, after Stroz Friedberg's review and comment period had expired on October 6, 2024,

Recoop's counsel emailed Stroz Friedberg and Thesis asking that the phrase "[p]repared under

the joint direction of both parties" be removed from the title page of the report.  *Id.* at ECF 8–9.

Thesis responded that "you had the opportunity to participate and it was your choice to not do so

more thoroughly," while noting that Thesis would agree that the cover page can state "[p]repared

in consultation with both parties."  *Id*.  Recoop made no response.  Dkt. No. 96-1 at ¶ 21.

Stroz Friedberg delivered the Report on October 22, 2024.  Dkt. No. 68-1.  The cover of

the Report reflects that it was "Prepared in consultation with both parties."  *Id.* at ECF 1.

In the Report, Stroz Friedberg first recounts its understanding of Recoop's allegations

that Freed "created and inserted 'rogue' tags or pixels on Recoop's website, hosted by the

platform Shopify, via GTM [Google Tag Manager], GA [Google Analytics], and Facebook/Meta

without Recoop's authorization in or prior to Feb. 2020 for the purpose of transmitting,

diverting, accessing, or otherwise obtaining Recoop's customer information for the benefit of

Thesis."  *Id.* at 4.  Stroz Friedberg's assignment was to identify evidence of (1) "[a]ccess by

Freed or Thesis to Recoop's website hosted on Shopify before and after Freed's departure from

Recoop in Feb. 2020"; (2) "[i]nsertion of the [GTM, GA, and Facebook/Meta] tracking

technologies in Recoop's Shopify code base" with ID numbers GTM-MSJ7KHL [GTM], UA-

57833108-2 [GA], and 1370548453107099 [Facebook/Meta tag]; and (3) "[t]ransmission of

information collected via Recoop's pixels and tags to Thesis or Freed, access of such information

without authorization from Recoop, or use of Recoop's information by Thesis or Freed."  *Id.* at

4–5.

Stroz Friedberg summarized its findings as follows:

A reference to [the specified GTM container GTM-MSJ7KHL] was present in a Shopify theme previously leveraged by the Recoop site. This theme was associated with the Shogun landing page plugin of Recoop's first Shopify site. Communications in Freed's Gmail account noted that the Shogun service was deactivated sometime in 2020, following Freed's departure from Recoop. GTM tags associated with the noted container were not present in future iterations of the Shopify site or its themes based on the evidence reviewed.

Permissions granting Freed access to the GTM container were removed by a Recoop contractor "4 years ago" (in 2020) according to GTM logs. Once Freed's access was terminated in 2020, his account was no longer able to access the GTM container or add or manage tags within the GTM container that Recoop identified as at issue in this lawsuit.

No evidence in Freed's personal account indicating usage, access, or copying of Recoop's tracking and analytic data after his departure from Recoop. Additionally, no copies of data transmitted from Recoop's tracking and analytic services were present in the reviewed Freed and Thesis accounts.

No transmission of data from the Recoop GA pixel [i.e., *not* the GA account ID UA-57833108-2 Stroz was tasked with locating] to any devices or services controlled by Thesis or Freed. Further, no changes by Freed's account to the Recoop GA pixel were logged after Freed's departure from Recoop.

The GTM container and pixels reviewed by Stroz Friedberg were created by an account other than Freed's during Freed's tenure at Recoop, in consultation with outside marketing partners including contractors at Constellation. While Freed's personal Google account was provisioned GTM access by a now-removed user, his Google account was among multiple contractors and Recoop employees who were granted access to the GTM container.

A screen-share meeting between Freed and Gagan Pandana Venkatesh of the Google Implementation support team was recorded by Freed in January of 2020. This recording was maintained in Freed's Loom video recording account. . . . This video, recorded during Freed's tenure at Recoop, documents the installation of the tag on Recoop's subdomain and checkout pages. The live output of the tag from a test order is documented and contains only four fields, none of which contain direct consumer information such as email addresses.

No transmission of data from the Recoop Meta Pixel [i.e., *not* the Facebook/Meta ID 1370548453107099 Stroz was tasked with locating] to any devices or services controlled by Thesis or Freed. Further, no changes by Freed to the Meta Pixel were logged after Freed's departure from Recoop.

Stroz Friedberg observed no Recoop customer data or records in the reviewed accounts and platforms belonging to Freed or Thesis.

The Report addressed the following questions and provided the following answers, among others:

Q8: Do the GTM, GA, and/or Facebook/Meta pixels at issue transmit information such as "Recoop's private communications with its customers and website visitors" as alleged in Recoop's Complaint?

A8 . . . Stroz Friedberg did not observe any customized configurations that would have enabled Recoop to track customer communications or sensitive information via its GTM, GA, and/or Facebook/Meta pixels.

Q9: Is it possible to hack or otherwise transmit a GTM, GA, and/or Facebook/Meta pixel to transmit such information? If so, how? Did Stroz Frieberg observe any evidence that would show such changes to how Recoop's GTM, GA, and/or Facebook/Meta pixels collected or transmitted information?

A9: GTM, GA, and/or Facebook/Meta are configured with default settings that capture metadata about users to the website (e.g. how many visitors made a purchase, what buttons visitors clicked on a webpage). GTM, GA, and/or Facebook/Meta pixels do have support for collection of customized data parameters. However, the configurations available for Stroz Friedberg's review did not show any evidence of any customization being leveraged. Further, Stroz Friedberg did not observe any changes to GTM, GA, and/or Facebook/Meta pixels by Freed or Thesis after Freed's departure from Recoop.

Q10: Did Stroz Friedberg observe any evidence that the GTM, GA, and Facebook/Meta pixels identified by Recoop were used to transmit data to Thesis?

A10: No, Stroz Friedberg did not observe any processes to export or forward data from Recoop platforms to those controlled by Thesis or Freed.

Q11: Did Stroz Friedberg observe any evidence of access or changes by Freed in Recoop's platforms following his Feb. 2020 departure from Recoop?

A11: No.

Q12: Did Stroz Friedberg observe any evidence of use of Recoop's customer information from its examination of Freed and Thesis's platforms?

A12: No, Stroz Friedberg observed neither collections nor exports of Recoop's customer information.

*Id.* at 17–18.

### III.    The Motion for Summary Judgment and Freed Declaration

On December 3, 2024, after settlement discussions broke down, Thesis and Freed moved to lift the stay in order to proceed with a motion for summary judgment, a potential motion for Rule 11 sanctions, and a motion to compel Recoop to pay its share of Stroz Friedberg's fees, leaving all other proceedings stayed.  Dkt. No. 93.  As noted, on December 5, 2024, the Court granted the motion to lift the stay.  Dkt. No. 94.

On December 13, 2024, Thesis filed a motion for summary judgment along with the declaration of counsel, a sworn declaration of Freed, a Rule 56.1 statement, a supporting memorandum of law, and a copy of the Report.  Dkt. No. 96.  In his declaration, Freed swore that he "did not at any time access Recoop's computer systems for an improper purpose, misappropriate Recoop's proprietary information or use or permit the use of any such information by Thesis."  Dkt. No. 96-13 ¶ 3.  He further swore that any actions he took while "a member and employee of Recoop were for the benefit of Recoop"; that the work he "performed in relation to marketing pixels was for the benefit of Recoop"; and further that "the three pixels referenced in Recoop's Complaint did not transmit the information alleged by Recoop to have been transmitted to Thesis or me; nor did Thesis or I use any such Recoop information."  *Id.*  ¶¶ 3–4.  He also noted that the Report confirmed he did not engage in any of the unlawful conduct alleged by Recoop, whether on his own behalf or on behalf of Thesis.  *Id.* ¶ 3.

The Freed declaration is detailed.  He explains that, while working for Recoop under the supervision and direction of Alt and alongside Recoop's third-party marketing agency Constellation, he used Google Tag Manager ("GTM"), a Google product that facilitates web designer's surveillance of how users interact with their websites by tracking and managing Google "tags."  *Id.* ¶¶ 16–17.  Freed was originally given access to Google Tag account ID number GTM MSJ7KHL (one of the allegedly nefarious tag IDs identified by Recoop) by "an

employee and/or contractor of Constellation" through his personal email address, "danfreed1@gmail.com," which he used during his period of work at Recoop. *Id.* ¶ 19. He declares that he was unaware, until this suit was brought, that this tag ID was still connected to his personal account, and that this tag ID was never owned or operated by Thesis or for the benefit of Thesis. *Id.* ¶¶ 20–21. As to the other two allegedly nefarious tags, Google Analytics pixel UA-57833108-2 and Meta pixel 1370548453107099, Freed was not aware of and could find no record of either number in his own or Thesis's electronic systems, though he declares that "[o]n March 15, 2024, a representative from Meta Platforms, Inc. confirmed in an email to a representative of Thesis that the Facebook/Meta ID number of 1370548453107099 is 'tied to getrecoop.com,' Recoop's website." *Id.* ¶ 29.

On December 20, 2024, the Court ordered that Recoop would have 30 days from the date of counsel's withdrawal on December 5, 2024, to make an appearance, and that should counsel appear, Recoop's opposition to the motion for summary judgment would be due 14 days thereafter, meaning on or before January 20, 2025. Dkt. No. 98.

On January 8, 2025, Thesis and Freed wrote to bring to the Court's attention that no counsel had appeared for Recoop by the January 6, 2025 deadline and to request that the pending motions be considered unopposed. Dkt. No. 100. They also requested leave to file a motion for Rule 11 sanctions against Recoop and for an award of attorney's fees under the DTSA, 18 U.S.C. § 1836(b)(3)(D), for Recoop's allegedly bad faith misappropriation claim. *Id.* Previously, on September 23, 2024, Thesis and Freed had sent Recoop a letter stating that they would seek sanctions unless Recoop (1) withdrew the complaint or provided evidence supporting its allegations and (2) explained the omission of Freed's involvement with Recoop. Dkt. No. 102-1.

On January 10, 2025, the Court issued an order stating that it intended to consider the pending motions unopposed and granting leave to file a motion for sanctions. Dkt. No. 101. The Court noted that it had previously warned that corporate entities such as Recoop may not appear in federal court without an attorney. *Id.*

On January 17, 2025, Thesis moved for sanctions against Recoop. Dkt. No. 102.

On March 10, 2025, 63 days after the deadline set by the Court, counsel from the firm Baritz Colman Richan & Harris LLP appeared for Recoop and Alt. Dkt. No. 103. On March 11, 2024, counsel wrote the Court asking for the opportunity to "enter into a reasonable briefing schedule" in connection with the pending motion for summary judgment, as "Recoop believes that there exist disputed material issues of fact precluding summary judgement." Dkt. No. 105. Thesis opposed the request. Dkt. No. 106. On March 14, 2025, the Court issued an order holding (1) that it would treat the pending motion for summary judgment as fully submitted without considering the submissions made by new counsel in March 2025; and (2) Plaintiff "may make any appropriate and permissible application or motion to the Court after the Court has ruled on the summary judgment motion." Dkt. No. 107.

## IV.    The Summary Judgment Opinion

The Court issued its Opinion and Order granting summary judgment to Thesis on April 14, 2025. At the heart of each of Plaintiff's claims was the allegation that Thesis or Freed "improperly acquired, disclosed, or used Recoop's customer data." Dkt. No. 108 at 14–15. But, the Court concluded, there was "no evidence that Defendant or Freed used any Recoop information in violation of an agreement or confidence or as a result of any improper means." *Id* at 15. Freed (but not Thesis) was granted access to Recoop's GTM legitimately and with the knowledge of Recoop's CEO Alt while employed by Recoop and responsible for its website

development.  *Id.* at 15.  However, "there is no evidence that Thesis or Freed disclosed or used

Recoop's customer data without authorization."  *Id.* at 15–16.  In sum, the Court concluded that:

> No data from Recoop's tracking tools were transmitted to any devices or services
> controlled by Thesis or Freed.  The last activity linked to Freed involving the
> specified GTM occurred in June 2019.  After Freed left Recoop on February 28,
> 2020, there was no evidence that he accessed or altered Recoop's GTM, GA, or
> Meta Pixel.  Freed's access to Recoop's GTM was also revoked in 2020, the year
> of his departure.  In the absence of evidence that Thesis received or used any
> Recoop data, Plaintiff cannot pursue a DTSA claim against Defendant.

*Id.* at 16.

**V.     Motion for Reconsideration**

On April 15, 2025, the Court set Defendant's motion for sanctions and motion to compel

cost-sharing for Stroz Friedberg's engagement for oral argument.  Dkt. No. 109.[3]

On April 28, 2025, Plaintiff filed a motion for reconsideration.  Dkt. No. 115.  Defendant

filed a memorandum of law in opposition to the motion on May 12, 2025.  Dkt. No. 117.  The

Court heard argument on the motion for reconsideration, as well as the motions for sanctions and

attorney's fees, on May 14, 2025.

## DISCUSSION

The Court first addresses the motion for reconsideration.  It then addresses the motion for

sanctions and attorney's fees.

**I.     The Motion for Reconsideration**

Plaintiff argues that the Court's order granting summary judgment in favor of Thesis

should be reconsidered because the Report was "incomplete and inaccurate," Freed's declaration

was self-serving, and there "exist disputed issues of material fact."  Dkt. No. 115-1 at 2.  Recoop

focuses on what it claims are a number of inadequacies in the Report: (1) "the Google Tag, the

---

[3] The argument was later rescheduled by order of April 17, 2025.  Dkt. No. 111.

Meta Tag, and the GTM Container were all created in accounts not owned by Recoop," and therefore "would not yield any material information on whether Freed used the Tags to transmit Recoop's proprietary marketing data to Thesis," *id.* at 5–6; (2) the "Report did not subpoena Google or Meta for the records" which would have been necessary because the Shopify records upon which Stroz Friedberg relied dated back only to June 19, 2024, *id.* at 6; and (3) "Stroz Friedberg's analysis of Freed's Google account merely focused on his Email and YouTube History, but failed to analyze the parts of Freed's Google account which would have actually contained information concerning the Tags," *id.* at 6. Recoop also argues that the Court should not have relied on Freed's declaration because the declaration contains "blatant misrepresentations." Dkt. No. 115-1 at 7.[4] In particular, Recoop asserts that Freed's statement that he was "not aware of GA ID of UA-57833108-2 until Recoop referenced it in this action," Dkt. No. 96-13 ¶ 25, is untrue, and consequently his statement that he did not "use, access or disclose any of Recoop's information relating to or in connection with this ID number," *id.*, cannot be relied upon, because in a video that Feed recorded of a meeting he had with a Google support person in January 2020 (the "Loom Video") the "Google Tag [was displayed] as a tag associated with Recoop's website." Dkt. No. 115-1 at 8–9.[5] Recoop also notes that Freed both had a copy of the Loom video and was able to share it with Stroz Friedberg, *id.* at 9–10, but does not identify any proprietary information in the video.

---

[4] Recoop's memorandum of law in support of reconsideration references an affidavit by Freed. Freed submitted only a declaration. The Court assumes that Recoop is referring to the Freed declaration at Dkt. No. 96-13.

[5] ("MR. RICHAN: Clearly, he was aware of that tag because he accessed it when he was sitting in front of the computer. THE COURT: Did I rely upon paragraph 25 in my opinion? MR. RICHAN: No, but you relied upon that affidavit, and it's our position that you lie once, you lie twice, you lie five times, and if the Court had that information, it would not have considered that declaration as a reliable piece of evidence, an undisputed piece of evidence.").

"A motion for reconsideration should be granted only if the movant identifies 'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'" *Spin Master Ltd. v. 158*, 2020 WL 5350541, at *1 (S.D.N.Y. Sept. 4, 2020) (quoting *Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Tr.*, 729 F.3d 99, 104 (2d Cir. 2013)).  Reconsideration of a court's previous order is an "extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources." *In re Health Mgmt. Sys., Sec. Litig.*, 113 F. Supp. 2d 613, 614 (S.D.N.Y. 2000) (citation omitted).  It is not a "vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a 'second bite at the apple.'" *Analytical Surveys, Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 52 (2d Cir. 2012) (quoting *Sequa Corp. v. GBJ Corp.*, 156 F.3d 136, 144 (2d Cir. 1998)).  "The standard for granting a motion for reconsideration 'is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked— matters, in other words, that might reasonably be expected to alter the conclusion reached by the Court.'" *Justice v. City of New York*, 2015 WL 4523154, at *1 (E.D.N.Y. July 27, 2015) (quoting *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995)).

Recoop's briefing offers nothing that warrants reconsideration.

At the threshold, Recoop identifies nothing now in its motion for reconsideration that was not available to it on January 20, 2025, when its opposition to the motion for summary judgment was due.  Recoop does not predicate its motion on the availability of new evidence.  It bases its motion entirely on what it claims to be the weaknesses in the Report and on a discrepancy

between a statement in the Freed declaration and the Loom Video.[6]  The motion of Thesis and Freed for summary judgment was filed on December 13, 2024.  Dkt. No. 96.  Recoop's response was due on January 20, 2025.  If there were flaws in the Report or discrepancies between Freed's declaration and the Loom Video, those could and should have been brought to the Court's attention through a timely-filed opposition to the motion for summary judgment.  Recoop eschewed its opportunity and right to respond.  It did not respond to the motion at all until March 10, 2025, when its newly-retained counsel wrote the Court asking for additional time before they would "be prepared to enter into a reasonable briefing schedule with counsel and the Court for the pending Motion."  Dkt. No. 105 at ECF 1–2.  Even then, counsel did not file an opposition to the motion for summary judgment.  Recoop was made aware of the deadlines and the need for it to have counsel in order to respond.  The Court reminded Recoop and Alt numerous times throughout the pendency of the case that Recoop would be at risk of default if it did not retain counsel.  *See e.g.*, Dkt. No. 74 at 2; Oct. 30 Tr. 2:23–3:7; Dkt. No. 90.  The Court gave Recoop until January 6, 2025 to retain counsel.  Dkt. No. 98.  No extension was ever requested.  Nor was counsel timely retained.  Good cause still has not been offered for the failure to retain counsel on the deadline set by the Court.  To entertain Recoop's arguments now, when all of them could have been made at the time, would be to make a mockery of the Court's deadlines and the good cause requirement for granting extensions under Rule 16(b)(4).

Recoop has not identified "an intervening change of controlling law or the need to correct a clear error or prevent manifest injustice."  *Spin Master*, 2020 WL 5350541, at *1 (quoting

---

[6] Recoop describes the Loom Video in its memorandum of law in support of the motion for reconsideration.  But the Loom Video was in possession of Recoop at the time of the summary judgment motion; it does not constitute "new evidence" for the purposes of a motion for reconsideration.  *See Kolel Beth Yechiel*, 729 F.3d at 104.

*Kolel Beth Yechiel*, 729 F.3d 99 at 104).  The law is today, as it was at the time of the summary judgment determination, that a plaintiff claiming misappropriation of a trade secret must prove that "(1) it possessed a trade secret, and (2) the trade secret was used by defendant in breach of an agreement, confidence, or duty, or as a result of discovery by improper means."  *Universal Instruments Corp. v. Micro Sys. Eng'g, Inc.*, 924 F.3d 32, 49 (2d Cir. 2019) (internal quotations omitted).  Under the DTSA, "misappropriation" includes (1) "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means," or (2) "disclosure or use of a trade secret of another without express or implied consent" in specified circumstances.  18 U.S.C. § 1839(5).  "Improper means" include "theft, bribery, misrepresentation, [and] breach or inducement of a breach of a duty to maintain secrecy," but exclude "reverse engineering, independent derivation, or any other lawful means of acquisition."  18 U.S.C. § 1839(6).  Recoop's remaining claims also require some evidence of interception or misappropriation of Recoop's customer communications by Thesis.  Dkt. No. 108 at 12–14.

Finally, the arguments made by Recoop do not show that the Court committed clear error in granting summary judgment or that there was manifest injustice in that decision.  The Court did not commit clear error, or indeed any error, in relying on the Report and on the Freed declaration, in granting summary judgment.  Recoop attempts to cast doubt on the Report, but that effort is unavailing.  Stroz Friedberg examined not only Freed's Gmail but also Freed and Thesis's Google and Meta accounts for evidence of the allegedly nefarious tag numbers identified by Recoop, and found that, other than GTM-MSJ7KHL, which Freed legitimately accessed for his work for Recoop before he separated in February 2020, there was no evidence that the other ID numbers identified by Recoop existed on or were used or accessed by Freed or

Thesis's systems or accounts.  Dkt. No. 96-4.  Regarding Recoop's assertions related to Shopify, the Report itself disclosed the limitations in the Shopify data, which Recoop was in any case responsible for as the Shopify data was in its custody.  *Id.* at 7.  In sum, none of the critiques offered by Recoop call into question the central finding of Report that the "GTMs, Gas, and Meta Pixels do not collect sensitive information by default, and there is no evidence of any customized configurations that would have allowed Recoop to do so" and "[t]here is no indication that any of Recoop's customer information was collected or exported."  Dkt. No. 108 at 15.

    As to the Freed declaration and the Loom Video, the evidence does not show that Freed lied in his declaration.  Freed stated that he was "not aware of GA ID of UA-57833108-2 until Recoop referenced it in this action."  Dkt. No. 96-13 ¶ 25.  Recoop asserts that the Tag was visible at one point during the Loom Video.  It has not disputed the representation made by counsel for Thesis that the tag ID was one of several numbers on the screen that was momentarily visible when Freed was trying to install a different Google Ad number.  *See* May 14 Hearing Tr. 34:10–19 ("There's a ton of code and numbers on that screen, but that's where it appears.  Mr. Freed, who was trying to install a different Google Ads number at that time, didn't look at that number, certainly didn't memorize that number. And so that is why, in his declaration, he's saying he was not aware of and has not accessed or used that number.").[7]  The evidence is not necessarily inconsistent with the declaration.  A person is not always "aware" in the present of something which was visible to him in the past.  For instance, a person is not "aware," in the present moment, of every phone number she has ever seen or used, but only of

---

[7] Tellingly, counsel for Recoop did not submit the Loom Video with its motion for reconsideration.

those phone numbers that she actually remembers having seen and used. Thus, the fact that a number is flashed on a screen does not necessarily show that the viewer would have taken note of and been aware of that number at the time. And, even if Freed was "aware" of the specific GA ID at the time of the Loom Video, the fact is immaterial—nothing turned on Freed's knowledge of the GA ID. The question was whether Freed misappropriated Recoop's data for the benefit of Thesis, not whether he saw a specific tag when he was working for Recoop. There would have been no reason for Freed to lie as to this point in his declaration.

Most fundamentally, however, even if the Report was not exhaustive and even if Freed misstated his awareness of the GA ID, the result would not be to deny Thesis summary judgment and to set this matter down for trial. Thesis did not have a burden of proof to show that it did not misappropriate Recoop's trade secrets—Recoop has and had that burden. Because Thesis did not bear the burden of proof, it satisfied its burden at summary judgment by "showing—that is pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (internal citations and quotations omitted). To forestall summary judgment in that event, the non-moving party must "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also id.* at 323, 326 (finding "no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim," given that "district courts are widely acknowledged to possess the power to enter summary judgments *sua sponte*, so long as the losing party was on notice that she had to come forward with all of her evidence"); *Selevan v. New York Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) ("A defendant is entitled to summary judgment where

'the plaintiffs have failed to come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on' an essential element of a claim on which the plaintiffs bear the burden of proof." (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010) (cleaned up)); *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009) ("When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim."); *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) ("In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim."); 10A C. Wright & A. Miller, Federal Practice and Procedure § 2720.1 (4th ed. 2025) ("[I]t is not necessary for the movant to introduce any evidence in order to prevail on summary judgment, at least in cases in which the nonmoving party will bear the burden of proof at trial. The movant can seek summary judgment by establishing that the opposing party has insufficient evidence to prevail as a matter of law, thereby forcing the opposing party to come forward with some evidence or risk having judgment entered against him.").

Moreover, to avoid summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citing *DeLuca v. Atl. Ref. Co.*, 176 F.2d 421, 423 (2d Cir. 1949) ("The plaintiff does not suggest that he is prepared to reply to these documents.  True, it may be too strong to say that it is impossible to conjure up any conceivable answer to them.  The original may have been forged; the authentication may be false . . . But if a motion for summary judgment is to have any office whatever, it is to put an end to such frivolous

possibilities when they are the only answer.") (L. Hand, J.), *cert. denied*, 338 U.S. 943 (1950));

*see also Jeffreys*, 426 F.3d at 554 ("[T]he mere existence of a scintilla of evidence in support of

the plaintiff's position will be insufficient; there must be evidence on which the jury could

*reasonably* find for the plaintiff." (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252

(1986))); *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (noting that the

non-moving party "may not rely on conclusory allegations or unsubstantiated speculation"

(internal quotation marks omitted)); *Trans Sport, Inc. v. Starter Sportswear, Inc.*, 964 F.2d 186,

188 (2d Cir. 1992) (noting that summary judgment cannot be defeated "on the basis of conjecture

or surmise" (internal quotation marks omitted)); *D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d

Cir. 1998) (noting that nonmoving party "must offer some hard evidence showing that its version

of the events is not wholly fanciful").  If the non-movant fails to do so, the moving party is

entitled to summary judgment.

Furthermore, the burden on the non-movant with the ultimate burden of proof at trial

cannot be discharged simply by asking the Court to disbelieve the evidence offered by the

moving party.  "The standard for granting summary judgment mirrors the standard for a directed

verdict under Federal Rule of Civil Procedure 50(a)."  *Celotex*, 477 U.S. at 323 (quoting

*Anderson,* 477 U.S. at 250 (alterations accepted)).  Learned Hand famously observed:

"[A]lthough it is therefore true that in strict theory a party having the affirmative might succeed

in convincing a jury of the truth of his allegations in spite of the fact that all the witnesses denied

them, we think it plain that a verdict would nevertheless have to be directed against him."  *Dyer*

*v. MacDougall*, 201 F.2d 265, 269 (2d Cir. 1952) (L. Hand, J.).  Thus, evidence that merely aims

to undermine the credibility of a witness cannot, by itself, meet the non-moving party's burden

under Rule 56.  *See* 10A C. Wright & A. Miller, Federal Practice and Procedure § 2720.1 (4th

ed. 2025) ("[E]ven if the movant's own evidentiary material reveals an issue of credibility, summary judgment still may be warranted if it also appears that the party opposing the motion cannot prevail in any event so that the issue of credibility is immaterial.").

The Court determined based on its independent review of the evidence submitted by Defendant that Thesis discharged its duty to show that there was an absence of evidence supporting Recoop's case. *See Amaker v. Foley*, 274 F.3d 677, 681 (2d Cir. 2001) (discussing court's independent duty to review the record before granting an unopposed motion for summary judgment); *see also Vermont Teddy Bear Co. v. 1-800 Beargram Co*., 373 F.3d 241, 244 (2d Cir. 2004) (same). Thesis offered the Freed declaration and the Report. It offered affirmative proof that there was no misappropriation. Freed attested in detail that he did not take or use any of Recoop's confidential information. He explained that his access to the Tags was in connection only with his responsibilities and duties as an employee and officer towards Recoop. The Report examined the evidence in possession of Thesis and determined that such evidence was inconsistent with the theory that Freed stole Recoop's confidential information. The Report also reflects that Stroz Friedberg reviewed Google and Meta accounts controlled by Thesis and Freed for any indication of the presence of Recoop's data and found none. *See* Dkt. No. 96-4 at 5 ("no copies of data transmitted from Recoop's tracking and analytic services were present in the reviewed Freed and Thesis accounts"); *id.* at 6 ("Stroz Friedberg observed no Recoop customer data or records in the reviewed accounts and platforms belonging to Freed or Thesis."); *id.* at 16–18 ("Based on Stroz Friedberg's . . . review of Thesis and Freed's Google, Facebook/Meta, and website, . . . Stroz Friedberg observed neither collections nor exports of Recoop's customer information.").

In response, Recoop still has offered nothing more than conjecture or surmise that Thesis misappropriated its trade secrets or committed any of the other torts with which it is charged. *See* May 14 Hearing Tr. 9:7–10 ("THE COURT: Is there any affirmative evidence that your client has with respect to the defendant misappropriating and misusing the information? MR. RICHAN: My client does not at this time."). Recoop may not simply mouth the words that there "exist disputed issues of material fact." Dkt. No. 115-1 at 2. It must proffer admissible evidence that would create a triable issue of fact before it is entitled to go to trial. Thus, even leaving aside Recoop's failure to present argument or evidence in opposition to the original motion for summary judgment and even assuming that there are weaknesses in the Report, Recoop would not prevail on a renewed motion for summary judgment. Recoop is therefore not entitled to reconsideration of the Court's order granting Thesis summary judgment.

## II. Defendant's Motion for Sanctions

Thesis also has moved for sanctions against Recoop under Federal Rule of Civil Procedure 11 and for an award of attorneys' fees under the DTSA, 18 U.S.C. § 1836(b)(3)(D). Dkt. No. 102. For the reasons that follow, the motion for Rule 11 sanctions and for attorneys' fees under the DTSA is denied.

### A. Rule 11 Sanctions

Rule 11(c) allows the court to sanction a party if it determines that the party has violated Rule 11(b) by making false, misleading, improper, or frivolous representations to the court. Fed. R. Civ. P. 11(c). However, a motion for sanctions "must not be filed or be presented to the court if the challenged paper, claim, defense, contention, or denial is withdrawn or appropriately corrected within 21 days after service or within another time the court sets." *Id.* 11(c)(2). If, during this twenty-one-day safe-harbor period, the non-moving party "withdraw[s] or

appropriately correct[s]" the alleged violation, it is shielded from Rule 11 liability for the offending filing. *Id.*

> The advisory committee note explains:

> To stress the seriousness of a motion for sanctions and to define precisely the conduct claimed to violate the rule, the revision provides that the "safe harbor" period begins to run only upon service of *the motion.* In most cases, however, counsel should be expected to give informal notice to the other party, whether in person or by a telephone call or letter, of a potential violation before proceeding to prepare and serve a Rule 11 motion.

*Id.* 11 Advisory Committee Notes (1993 Amendment) (emphasis added).

Accordingly, under the safe harbor provision, the moving party must serve the non-moving party with a "motion" at least 21 days before filing it in court. The purpose of this requirement is to give the non-moving party time to withdraw or correct the challenged pleading. *See Demaree v. Castro*, 2023 WL 6465881, at *15 (S.D.N.Y. Oct. 4, 2023); *Charles Equip. Energy Sys., LLC v. INNIO Waukesha Gas Engines, Inc.*, 2023 WL 2346337, at *3 (S.D.N.Y. Mar. 3, 2023).

Defendant and Freed sent Plaintiff a letter on September 23, 2024, threatening to file a Rule 11 motion unless Plaintiff withdrew the complaint, or produced evidence supporting its allegations and explained the omission of Freed's involvement with Recoop. Dkt. No. 102-1. The letter also outlined the grounds for the motion and cited legal authorities in footnotes. *Id.* On January 17, 2025, Defendant ultimately moved for sanctions on January 17, 2025. Dkt. No. 102.[8]

However, "[t]he safe-harbor provision is a strict procedural requirement." *Star Mark Mgmt., Inc. v. Koon Chun Hing Kee Soy & Sauce Factory, Ltd*., 682 F.3d 170, 175 (2d Cir.

---

[8] While the Court granted the Defendant leave to file a motion for sanctions, it did not exempt the Defendant from the procedural requirements of Rule 11. *See* Dkt. No. 101.

2012). "An informal warning in the form of a letter without service of a separate Rule 11 motion is not sufficient to trigger the 21–day safe harbor period." *Id.*; *see Balderramo v. Go New York Tours Inc.*, 668 F. Supp. 3d 207, 234 (S.D.N.Y. 2023) ("The safe harbor period begins to run only upon service of the motion."). Courts in this Circuit have consistently held that a letter, absent a formal notice of motion, is insufficient to satisfy Rule 11's safe harbor requirement. *See, e.g.*, *Balderramo*, 668 F. Supp. 3d at 234 (denying Rule 11 sanctions where movant served two detailed warning letters); *Kumaran v. Nat'l Futures Ass'n*, 2024 WL 3429128, at *2 (S.D.N.Y. July 16, 2024) (rejecting Rule 11 sanctions where movant only served a "Safe Harbor Notice" without a cross-motion for sanctions); *Gal v. Viacom Int'l, Inc.*, 403 F. Supp. 2d 294, 309 (S.D.N.Y. 2005) ("[T]he plain language of the rule states explicitly that service of the motion itself is required to begin the safe harbor clock—the rule says nothing about the use of letters."); *Lancaster v. Zufle*, 170 F.R.D. 7 (S.D.N.Y. 1996) ("[T]he plain language of the Rule expressly requires the serving of a formal motion, and with good reason, for by serving such a motion a movant . . . places its adversary on notice that the matter may not be viewed as simply part of the paper skirmishing among adversaries that too often characterizes litigation in this uncivil age."); *Castro v. Mitchell*, 727 F. Supp. 2d 302, 307 (S.D.N.Y. 2010) ("Courts have held that even a letter detailing the nature of the conduct which purportedly violates Rule 11 and threatening to file a motion for sanctions cannot constitute notice under Rule 11." (citing cases)); *see also Star Mark*, 682 F.3d at 176 ("[The movant] did more than send a Rule 11 letter—it attached to its letter a copy of its notice of motion for sanctions."). Since Defendant failed to comply with Rule 11's procedural requirements, its motion for sanctions is denied.

B.        **Sanctions Pursuant to the DTSA**

The DTSA provides that "[i]n a civil action brought . . . with respect to the misappropriation of a trade secret, a court may" "award reasonable attorney's fees to the prevailing party" if (1) "a claim of the misappropriation is made in bad faith, which may be established by circumstantial evidence," (2) "a motion to terminate an injunction is made or opposed in bad faith," or (3) "the trade secret was willfully and maliciously misappropriated." 18 U.S.C. § 1836(b)(3)(D).

The Second Circuit has not set forth the showing that must be made to demonstrate that a claim "is made in bad faith" so as to permit an award of attorney's fees.  Following the Second Circuit's interpretation of the Equal Access to Justice Act, 28 U.S.C. § 2412(b), in *Kerin v. U.S. Postal Service*, 218 F.3d 185, 190 (2d Cir. 2000), two magistrate judges in the Southern District have held that the bad faith standard under the DTSA tracks the common law standard for fee shifting and is satisfied by a showing that "the losing party's claim was (1) meritless; and (2) brought for improper purposes such as harassment or delay."  *Bronx Conservatory of Music, Inc. v. Kwoka*, 2024 WL 3521804, at *8 (S.D.N.Y. 2024) (defining "bad faith" in the context of the court's inherent power to sanction); *Insurent Agency Corp. v. Hanover Ins. Co.*, 2020 WL 86813, at *8 (S.D.N.Y. Jan. 9, 2020) (also adopting *Kerin* standard), *report and recommendation adopted sub nom.*, 2020 WL 1080774 (S.D.N.Y. Mar. 6, 2020).  Under that standard, both meritlessness and improper purpose are required.  "The test is conjunctive and neither meritlessness alone nor improper purpose alone will suffice."  *Bronx Conservatory*, 2024 WL 3521804, at *8 (quoting *Sierra Club v. United States Army Corps of Eng'rs*, 776 F.2d 383, 390 (2d Cir. 1985)).

The decisions of Circuit Courts in other Circuits have differed slightly in their formulation of the standard for a claim made in bad faith under the DTSA.  The Third Circuit has

held that "[a] claim is brought in bad faith if the plaintiff 'complete[ly] lack[ed] . . . evidence' and '[knew] or [was] reckless in not knowing that its claim[s]' lacked merit." *Elmagin Capital, LLC*, 2024 WL 2845535, at *5 & n.14 (quoting *Krafft v. Downey*, 68 A.3d 329, 336 & n.9 (Pa. 2013)). The Seventh Circuit has adopted a slightly broader formulation and stated that "bad faith claims include frivolous claims and claims brought or *maintained* for an improper purpose, 'such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.'" *LQD Bus. Fin., LLC v. AKF, Inc.*, 2025 WL 830444, at *4 (7th Cir. Mar. 17, 2025) (quoting *Multimedia Sales & Mktg., Inc. v. Marzullo*, 188 N.E.3d 789, 795 (Ill. App. Ct. 2020)) (emphasis added); *see also Tradesman Int'l, Inc. v. Black*, 724 F.3d 1004, 1016 (7th Cir. 2013) (holding regardless of the plaintiff's intentions at the time of filing, a claim is made in bad faith when it is pursued after it is clear that the plaintiff has no chance to prevail). The Sixth Circuit has stated that while more "is required than the knowing pursuit of meritless claims," the bad faith showing mandated by the DTSA is satisfied by evidence "that a party's claim was meritless, that the party knew at a certain point that it was meritless and nonetheless maintained it, and that the party brought or maintained the claim for some improper purpose." *Shepard & Assocs., Inc. v. Lokring Tech., LLC*, 2025 WL 1420931, at *4 (6th Cir. May 16, 2025). The Fourth Circuit has stated simply that a finding of bad faith "requires, at a minimum, that the plaintiff's 'claim had no chance of success under existing law.'" *Akira Techs., Inc. v. Conceptant, Inc*., 773 F. App'x 122, 125 (4th Cir. 2019) (quoting *Tullidge v. Bd. of Supervisors of Augusta Cty.,* 391 S.E.2d 288, 290 (Va. 1990)).

District Courts too have adopted slightly different formulations. Most courts hold that claim must be "objectively specious" and that Plaintiff must have engaged in "subjective misconduct in bringing the claim." *See e.g., Call Delivery Systems, LLC v. Morgan*, 2024 WL

4738322, at *2 (C.D. Cal Sept. 11, 2024); *Johnson Matthey Process Techs., Inc. v. G.W. Aru LLC.*, 603 F. Supp. 3d 1374, 1379 (S.D. Ga. 2022). Some courts, however, add that the subjective element can be satisfied by evidence of improper purpose in maintaining the meritless claim, *see Cashman Dredging & Marine Contracting Co., LLC v. Belesimo*, 759 F. Supp. 3d 120, 154 (D. Mass. 2024), including the possibility that the decision to "procee[d] to trial after the action's fatal shortcomings are revealed by opposing counsel,'" can support an award of attorney's fees under the DTSA, *Swarmify, Inc. v. Cloudflare, Inc.*, 2018 WL 4680177, at *2 (N.D. Cal. Sept. 28, 2018) (quoting *FLIR Sys. v. Parrish*, 95 Cal. Rptr. 3d 307, 315 (Cal. Ct. App. 2009)); *see also Stilwell Dev. Inc. v. Chen*, 1989 WL 418783, at *3 (C.D. Cal. Apr. 25, 1989) (holding that California trade secret statute "utilizing the word 'made' must, at least, encompass actions taken to maintain the claim").

In the absence of binding precedent from the Second Circuit, the Court applies principles of statutory interpretation to the attorney's fees provision of the DTSA. "Courts interpret statutes, no matter the context, based on the traditional tools of statutory construction" *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 403 (2024). The Court looks to the statute's text, context, and structure, as well as its history and purpose, to discern the meaning of the statute. *See Gundy v. United States*, 588 U.S. 128, 141 (2019). There are several requirements for the award of attorney fees under the DTSA: (1) the recipient must be "the prevailing party"; (2) either "a claim of the misappropriation is made in bad faith, . . . a motion to terminate an injunction is made or opposed in bad faith, or the trade secret was willfully and maliciously misappropriated"; and (3) the court must in the exercise of its discretion determine that an award of fees is warranted. 18 U.S.C. § 1836(b)(3)(D).

A defendant is a prevailing party "when the case is resolved in the defendant's favor, whether on the merits or not." *CRST Van Expedited, Inc. v. E.E.O.C.*, 578 U.S. 419, 432 (2016). It is sufficient that the defendant is "[t]he party ultimately prevailing when the matter is finally set at rest." *Lackey v. Stinnie*, 145 S. Ct. 659, 667 (2025) (quoting Black's Law Dictionary 1352); *TransPerfect Global, Inc. v. Lionbridge Technologies, Inc.*, 2022 WL 2119344 at *2 (S.D.N.Y. May 31, 2022) (finding the defendants to be the prevailing party after a successful motion for summary judgment dismissing the action with prejudice).

A fee award is justified under the DTSA only if "the claim of misappropriation is made" in bad faith.  Other statutes and rules, such as Rule 11 and 28 U.S.C. § 1927 address general litigation misconduct.

To suffice for "bad faith" under the DTSA, it is necessary that plaintiff's suit be both "objectively specious" and that the plaintiff exhibit subjective bad faith in making the claim. "Objective speciousness exists where there is a complete lack of evidence as to every element of a misappropriation of trade secrets claim." *Cashman Dredging*, 759 F. Supp. 3d at 154 (quoting *Anywhere Com., Inc. v. Ingenico Inc*., 2023 WL 6961882, at *3 (D. Mass. 2023)); *Workplace Techs. Rsch., Inc. v. Project Mgmt. Inst., Inc*., 664 F. Supp. 3d 1142, 1159 (S.D. Cal. 2023) ("[O]bjective speciousness exists where the action superficially appears to have merit but there is a complete lack of evidence to support the claim.").  But "objective speciousness" must be accompanied by a showing of subjective bad faith—it is not sufficient that the claim merely be without merit or fail as a matter of proof.  *See Insurent Agency Corp.*, 2020 WL 86813, at *9.  At the outset of a case, the plaintiff does not always know what discovery will reveal.  "[C]ourts are sensitive to 'the common scenario where the trade secrets plaintiff may not know which parts of its trade secrets have been misappropriated or cannot determine the full scope of its claims until

it gains a better understanding of how a defendant operates.'" *Id.* (quoting *Uni-Sys., LLC v. U.S. Tennis Ass'n*, 2017 WL 4081904, at *4 (E.D.N.Y. Sept. 13, 2017)).  The imposition of a fee award against the owner of a trade secret with an objectively reasonable, though ultimately meritless, litigant position would not serve the interests of the DTSA.  *Cf. Matthew Bender & Co., Inc. v. West Publ'g Co.*, 240 F.3d 116, 122 (2d Cir. 2001).  It is not sufficient that the plaintiff has borne ill will towards the defendant or harbored an improper motive in filing suit.  An injured party not infrequently bears ill will to one whom she believes has caused her harm.  If the plaintiff's litigation position is not wholly without merit; the law does not penalize her for acting with other than a pure heart.

As to the subjective component under the DTSA, it is not enough that the plaintiff's claim was wholly without merit if the plaintiff believed in good faith that it had merit and brought the claim to have the court address it.  Courts exist to resolve disputes between parties, even those that are ultimately without merit.  The answer under the American rule is that the wrongfully accused defendant obtain a judgment in his favor; it is not that he also inflict his cost of defense on the plaintiff.  Subjective good faith is a state of mind reflecting "honesty in belief or purpose." *Ziparo v. CSX Transportation, Inc.*, 15 F.4th 153, 158 (2d Cir. 2021) (quoting *Good Faith*, Black's Law Dictionary (11th ed. 2019)).  By contrast, "[s]ubjective misconduct exists where a plaintiff knows or is reckless in not knowing that its claim for trade secret misappropriation has no merit." *Cashman Dredging*, 759 F. Supp. 3d at 154 (quoting *Anywhere Com.*, 2023 WL 6961882, at *3)).  A party who pursues litigation for purposes of harassment or simply to inflict harm on its adversary is not acting in good faith.  Under the DTSA, the plaintiff's bad faith is not judged solely on the basis of the face of the complaint but may also be established by "circumstantial evidence."  18 U.S.C § 1836(b)(3)(D).

Finally, a fee award is never required. "The word 'may' clearly connotes discretion." *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 533 (1994) (interpreting "the court may also award a reasonable attorney's fee to the prevailing party as part of the costs" in 17 U.S.C. § 505).

Measuring Plaintiff's conduct against the applicable standards, the Court concludes that an award of fees under the DTSA is not appropriate. While there are elements of the complaint and amended complaint that are suggestive of an improper purpose,[9] Defendant has not established that Plaintiff's claim of misappropriation was objectively specious. Plaintiff had evidence that an employee and member of Recoop who worked for it had installed tags that sent data to destinations that were unknown to Recoop. It also had evidence that such member was the Chief Executive Officer of Thesis, a competitor of Recoop that was in a position to benefit from Recoop's information. And it also was able to make allegations, which have not been challenged, that Thesis had achieved business success. Under these circumstances, the Court cannot say from the face of the complaint that it was wholly without merit. Nor can the Court say from the circumstantial evidence before it that Plaintiff knew at the time she filed the complaint or the amended complaint that the claims of misappropriation she made were without merit. The unexplained failure of a plaintiff to prosecute her claims might, under some circumstances, give rise to inferences both that the plaintiff knows that her claims lack any evidentiary merit and correspondingly that they are brought for an improper purpose. But here, while the question is close, Plaintiff's failure to prosecute is not entirely unexplained. It is explicable by the request of Plaintiff's counsel to withdraw and Plaintiff's apparent challenges in finding new counsel.

---

[9] These include Plaintiff's failure to identify that Freed had access to Recoop's systems in his capacity as a member of Recoop and the gratuitous reference to Thesis's investors in Plaintiff's original and amended complaints.

Ultimately, Thesis argues that the Court should infer bad faith because "[n]ot a single shred of evidence was identified in support of Recoop's claims throughout the course of document and forensic expert discovery," Dkt. No. 102 at 2, and because Recoop engaged in conduct that "needlessly increased the cost of litigation," *id.* The Court does not disagree with Thesis's characterization of the evidence and of Recoop's conduct. But a failure of proof does not alone establish that the claim was brought in bad faith, *see Insurent Agency Corp.*, 2020 WL 86813, at *9, and there are other rules that address the unreasonable multiplication of proceedings, *see* 28 U.S.C. § 1927. Although the question is close, the Court concludes that Thesis has not established its right to fees under the DTSA.

## CONCLUSION

Plaintiff's request for reconsideration is DENIED. Defendant's request for Rule 11 sanctions and attorney's fees under the DTSA is DENIED.

The Clerk of Court is respectfully directed to close Dkt. Nos. 43, 70, 102, 115.[10]

SO ORDERED.

Dated: June 20, 2025
      New York, New York

_____
LEWIS J. LIMAN
United States District Judge

---

[10] Dkt. No. 43 is deemed moot in light of the filing of the Report at Dkt. No. 68-1. Dkt. No. 70 is deemed moot in light of the grant of the Court's grant of a subsequently renewed motion to withdraw at Dkt. No. 81, 94.